MICHAEL H. STOUGH AND BARBARA M. STOUGH, PETITIONERS
*v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8256–11.　　　　　Filed June 2, 2015.

Lessor (Ps) constructed a commercial building and entered into a 10-year lease with Lessee (L). The lease requires L to pay monthly rent to Ps, and the monthly rent is based on the amount of "project costs" Ps incurred in acquiring and developing the leased property. The lease provides L with the uni-

lateral option to make a one-time payment to Ps to reduce "project costs" to be used in the calculation of rent and thus reduce the amount of rent otherwise owed by L under the lease. In 2008 L elected to make a $1 million payment to Ps pursuant to the terms of the lease. R argues that the $1 million payment is rental income to Ps and is reportable for the year of receipt (i.e., 2008). Ps argue that the $1 million payment is not rental income. Alternatively, Ps argue that pursuant to I.R.C. sec. 467 the $1 million payment received from L is reportable as rental income ratably over the 10-year life of the lease. *Held*: The $1 million payment is rental income to Ps. *Held*, *further*, I.R.C. sec. 467(b)(1)(A) provides that the amount of rent under any sec. 467 agreement shall be determined "by allocating rents in accordance with the agreement". Sec. 1.467–1(c)(2)(ii)(B), Income Tax Regs., provides that, "[i]f a rental agreement does not provide a specific allocation of fixed rent * * * the amount of fixed rent allocated to a rental period is the amount of fixed rent payable during that rental period." The lease entered into between Ps and L states only when rent is payable and does not specifically allocate rent. The $1 million payment was due and payable in 2008. Therefore, Ps must report the entire $1 million payment as rental income for the year of receipt. *Held*, *further*, under sec. 1.467–1(d)(2)(i) and (ii), Income Tax Regs., the constant rental accrual and proportional rental accrual methods are inapplicable to the lease at issue.

*Stanley L. Ruby* and *David M. Meranus*, for petitioners.
*Richard J. Hassebrock*, for respondent.

RUWE, *Judge*: Respondent determined a $300,332 deficiency in petitioners' 2008 Federal income tax and a $58,117.20 accuracy-related penalty under section 6662(a).[1] On one of their 2008 Schedules E, Supplemental Income and Loss, petitioners reported as rents received a $1 million payment from Talecris Plasma Resources, Inc. (Talecris). Petitioners then claimed an offsetting $1 million Schedule E "contribution to construct" deduction (Schedule E deduction). Upon examination respondent disallowed the $1 million Schedule E deduction but increased petitioners' basis in the subject rental property and allowed petitioners $87,868 in additional depreciation.[2] Petitioners no longer contend that

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties agree that if we sustain respondent's determination as to
Continued

they are entitled to the $1 million Schedule E deduction but instead argue that they improperly reported as rents received the $1 million payment.

After concessions by the parties,[3] the issues remaining for decision are: (1) whether the $1 million lump-sum payment made by Talecris during the taxable year 2008 is rental income to petitioners; (2) if the $1 million payment is rental income, whether petitioners may allocate the $1 million payment proportionately over the life of the lease pursuant to section 467; and (3) whether petitioners are liable for an accuracy-related penalty under section 6662(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, Michael H. Stough (petitioner) resided in Wyoming, and Barbara M. Stough resided in Ohio.[4]

Petitioner is the sole shareholder of an Ohio corporation named Stough Development Corp. (SDC). SDC was incorporated in January 1994 and, for the taxable year at issue, operated as a subchapter S corporation. SDC is a real estate development company primarily in the business of acquiring and developing real estate for use as plasma collection centers.

Talecris, a Delaware corporation and wholly owned subsidiary of Talecris Biotherapeutics Holdings Corp. (Talecris Holdings), also a Delaware corporation,[5] operates plasma

_____

the $1 million in rental income and disallowance of the $1 million Schedule E deduction, then the $87,868 in additional depreciation is allowable.

[3] Petitioners concede: (1) $2,773 in ordinary dividend income; (2) $1,808 in qualified dividend income; (3) $20,699 in interest income; and (4) $34,343 in Schedule E income as set forth in the notice of deficiency. Petitioners further concede a $463 utility expense deduction. Petitioners agree that respondent properly adjusted the total amount of deductions petitioners claimed on Schedule A, Itemized Deductions, for 2008 by increasing the deductions by $14,747.

[4] The parties stipulate that petitioners maintained a mailing address in Ohio at the time they filed their petition.

[5] On June 1, 2011, Grifols Therapeutics, Inc., a Spanish corporation headquartered in Barcelona, Spain, acquired Talecris Holdings and all of its subsidiaries, including Talecris.

collection centers in various locations throughout the continental United States for the purpose of manufacturing and selling plasma protein therapeutics.

On December 15, 2006, SDC and Talecris entered into a development agreement and related guaranty agreement wherein SDC agreed to acquire real property in a location acceptable to Talecris and to construct a plasma collection center pursuant to Talecris' specifications. Attached as an exhibit to the development agreement was a proposed lease to be entered into by SDC and Talecris once the plasma collection center project was complete. The proposed lease required Talecris to lease the plasma collection center from SDC for an initial term of 10 years. Petitioner negotiated the terms of both the development agreement and the proposed lease on behalf of SDC, while James H. Moose acted as the lead negotiator for Talecris.[6]

On September 10, 2007, pursuant to the terms of the development agreement, SDC acquired title via general warranty deed to a parcel of real property in North Carolina (NC property). In order to fund the acquisition of the NC property and to facilitate the subsequent construction of the plasma collection center, SDC took out a commercial loan with PNC Bank. Petitioner was personally liable for the commercial loan. Talecris was not liable on or obligated to make payments under the commercial loan.

On September 24, 2007, SDC transferred to Wintermans, LLC (Wintermans), title to the NC property via general warranty deed. Wintermans is an Ohio limited liability company wholly owned by petitioner and is treated as a disregarded entity for purposes of Federal income tax for the taxable year 2008.

On February 19, 2008, SDC received a certificate of occupancy for the newly constructed plasma collection center. Talecris moved into the plasma collection center sometime in February 2008. Although the proposed lease between Talecris and SDC had not yet been executed when Talecris moved into the plasma collection center, Talecris began paying rent on March 1, 2008.

---

[6] Mr. Moose was an executive at Talecris from 2005 to 2010. When Mr. Moose retired from Talecris in 2010, his title was senior vice president.

On June 6, 2008, Wintermans and Talecris executed the proposed lease [7] whereby Talecris agreed to lease the plasma collection center from Wintermans for 10 years. There is no indication and the parties do not argue that the terms of the proposed lease and the final lease differ. The lease required Talecris to pay monthly rent to Wintermans, and the rent would be determined by a mathematical formula based on "project costs" that SDC incurred in acquiring and developing the plasma collection center. Article 1 of the lease defines project costs as "the sum of (a) the Acquisition Costs, (b) the Hard Construction Costs, (c) the Soft Construction Costs, and (d) the Financing Costs." The calculation of monthly rent to be paid by Talecris to Wintermans involves a two-step process: (1) project costs are multiplied by 90% to arrive at "base rent"; [8] and (2) base rent is multiplied by 125% and then divided by 12 to arrive at monthly rent.

Section 4.1(a)(v) of the lease allows Talecris, on or before the commencement date, to provide written notice to Wintermans to elect to pay or reimburse Wintermans in a lump sum for any portion of the project costs. Section 4.1(a)(v) of the lease provides:

> (v) Notwithstanding any other provisions of this Lease to the contrary, Tenant may, by written notice given by Tenant to Landlord on or prior to the Commencement Date, elect to pay or reimburse Landlord in a lump sum for any portion of the Project Costs as Tenant may specify in such notice. If Tenant makes such an election, Tenant shall, on or prior to the Commencement Date, make a lump sum payment to Landlord in respect of Project Costs in the amount specified in Tenant's notice of election, and, for purposes of determining the Assumed Term Loan Principal Amount, the Assumed Term Loan Amortization Amount and the Base Rent, the Project Costs and the Maximum Project Costs shall be reduced by the amount of such payment.

Because rent is a function of project costs, a lump-sum payment under section 4.1(a)(v) of the lease would reduce project costs, and consequently, reduce the amount of rent that Talecris owed under the lease. It was within the sole discre-

_____

[7] Talecris and SDC executed the December 15, 2006, development agreement with a related guaranty and proposed lease. The final lease of the plasma collection center, executed on June 6, 2008, involved Talecris and Wintermans.

[8] In years 6–10 of the lease, Talecris' base rent increases to 103% of the base rent in effect for the immediately preceding lease year.

tion of Talecris to make an election under section 4.1(a)(v) of the lease and to determine the amount of such lump-sum payment.

As of April 1, 2008, there was an outstanding balance of $2,365,400.72 owed by SDC on the commercial loan. On April 17, 2008, Talecris made a $1 million lump-sum payment to Wintermans pursuant to section 4.1(a)(v) of the lease.[9] Petitioners applied the $1 million lump-sum payment to the outstanding balance of the PNC Bank commercial loan.

Talecris issued to Wintermans a Form 1099–MISC, Miscellaneous Income (original Form 1099–MISC), reporting rents of $1,151,493.18 for 2008. This amount represents $151,493.18 in monthly rent for the plasma collection center along with the $1 million lump-sum payment pursuant to section 4.1(a)(v) of the lease.

Petitioners jointly filed a Form 1040, U.S. Individual Income Tax Return, for 2008. On one of the Schedules E attached to the return petitioners reported rents received of $1,151,493 in connection with the plasma collection center rental. Among the deductions that petitioners claimed on this Schedule E was a $1 million "contribution to construct" expense. Certified Public Accountant (C.P.A.) Thomas D. Heldman prepared petitioners' Form 1040 for 2008.

On April 16, 2010, respondent began an examination of petitioners' 2008 tax return. In a letter dated November 18, 2010, Michael V. Paul, chief operating officer of SDC, wrote to Staci Baranchak, Talecris' accounts payable manager, requesting, inter alia, that Talecris amend the original Form 1099–MISC issued to Wintermans to treat the $1 million lump-sum payment as a "buy-down reimbursement" of construction cost. At a date not specified in the record, Talecris issued to Wintermans a corrected Form 1099–MISC (corrected Form 1099–MISC), reporting rents of $151,493.18 for 2008.

On January 12, 2011, respondent issued to petitioners a notice of deficiency for 2008, disallowing the claimed $1 million Schedule E deduction but increasing petitioners' basis in

[9] Although the lease was not executed until June 6, 2008, the parties agree that the $1 million lump-sum payment was made pursuant to section 4.1(a)(v), the terms of which are identical in both the proposed lease and the final lease. It is unclear from the record whether Talecris provided written notice of its election to Wintermans.

the plasma collection center and allowing petitioners $87,868 in additional depreciation.[10] Petitioners timely filed a petition disputing the determinations in the notice of deficiency.

OPINION

As a general rule, the Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayers bear the burden of proving that the determinations are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Pursuant to section 7491(a)(1), the burden of proof with respect to relevant factual issues may shift to the Commissioner. Specifically, section 7491(a)(1) provides: "If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." Section 7491(a)(2) further provides that the burden of proof shifts to the Commissioner only when the taxpayer has: (1) "complied with the requirements under this title to substantiate any item", and (2) "maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews". "'Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted'". *Higbee v. Commissioner*, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105–599, at 240–241 (1998), 1998–3 C.B. 747, 994–995). Because we decide this case on the preponderance of the evidence, the allocation of the burden of proof does not affect the outcome and need not be decided. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008).

1. *Rental Income*

The first issue for decision is whether the $1 million lump-sum payment made by Talecris to Wintermans pursuant to

_____

[10] The basis increase is allocated as follows: (1) $241,999.66 to the land; (2) $626,526.53 to the plasma collection center building; and (3) $131,473.81 to fixtures. This results in additional depreciation for 2008 of $12,737 for the plasma collection center building and $75,131 for the fixtures.

section 4.1(a)(v) of the lease constitutes rental income to petitioners for 2008. Although petitioners initially reported this amount as rental income on one of their Schedules E, they now argue that this reporting was in error and that the $1 million lump-sum payment does not constitute rental income for 2008. Specifically, petitioners argue that the $1 million lump-sum payment was not intended as rent by the parties to the lease but rather was meant to reimburse petitioners for leasehold improvements to the plasma collection center. Respondent argues that "the $1,000,000.00 payment received by the petitioners from * * * [Talecris] is considered additional rental income to the petitioners pursuant to Treasury Regulation § 1.61–8(c) and was properly reported as such on petitioners' 2008 Form 1040."

Section 61(a) defines gross income to mean all income from whatever source derived, including rental payments received or accrued during the taxable year. Sec. 61(a)(5); sec. 1.61–8(a), Income Tax Regs. Section 1.61–8(c), Income Tax Regs., provides, in pertinent part:

> (c) Expenditures by lessee.—As a general rule, if a lessee pays any of the expenses of his lessor such payments are additional rental income of the lessor. If a lessee places improvements on real estate which constitute, in whole or in part, a substitute for rent, such improvements constitute rental income to the lessor. Whether or not improvements made by a lessee result in rental income to the lessor in a particular case depends upon the intention of the parties, which may be indicated either by the terms of the lease or by the surrounding circumstances. * * *

When a lessee pays an expense or obligation incurred by the lessor in bringing the leased property into existence, there is a direct economic benefit to the lessor to the extent that the lessor is relieved of his or her financial obligations. Under these circumstances there is no ambiguity regarding the financial benefit that the lessor receives. That being the case, there need be no inquiry into the intent of the lessor and lessee unless the lessee's payments were unrelated to the lease. In the instant case there is no question that the $1 million lump-sum payment was made pursuant to the terms of the lease; was optional at the election of the lessee; was to "reimburse" the lessor for "project costs" [11] incurred

---

[11] The lease clearly defines "project costs" as the sum of acquisition costs,

Continued

and paid by the lessor in bringing the property into existence; and reduced the lessee's future rents otherwise due. Given these facts the $1 million lump-sum payment falls within the purview of section 1.61–8(c), Income Tax Regs., as the lessee's payment of the lessor's expenses and therefore constitutes rent without the need to inquire into the subjective intent of the parties. *See Satterfield v. Commissioner*, T.C. Memo. 1975–203, 1975 Tax Ct. Memo LEXIS 170.

Petitioners nevertheless argue that the subjective intent of the parties should control. We disagree because this is not a case of improvements made by a lessee. A lessee's payment for leasehold improvements may or may not result in rental income to the lessor depending on the intent of the parties, which may be indicated by the terms of the lease or by the surrounding circumstances. *Id.*; *see M.E. Blatt Co. v. United States*, 305 U.S. 267 (1938). There may be situations where an improvement made by a lessee is not intended to compensate a lessor. Indeed, an improvement by a lessee might be worthless or even provide a detriment to the lessor. For example, the useful life of such an "improvement" by the lessee may not extend beyond the term of the lease, in which case it has no value to the lessor and, in fact, may impose a financial detriment if the lessor is responsible for its removal upon termination of the lease. Here the lessee made no leasehold improvements. Rather, the lessee exercised its option to pay $1 million to petitioners in order to reduce the amount of "project costs" for purposes of calculating annual rent.

Even if we were to look into the parties' intentions, the terms of the lease and the surrounding circumstances convince us that the $1 million lump-sum payment was intended as payment for the use of the leased property. First, the operative provision allowing for the lessee's election of a lump-sum payment—section 4.1(a)(v)—is included within article IV of the lease, entitled "RENT". Second, Mr. Moose testified that the purpose of lease section 4.1(a)(v) was to "provide Talecris flexibility in the amount of rental payments

---

hard construction costs, soft construction costs, and financing costs. At a minimum, acquisition and financing costs do not constitute a reimbursement for leasehold improvements to the plasma collection center.

that they would be liable for in the future". [12] Third, both parties to the lease treated the $1 million lump-sum payment as rent before respondent's examination of petitioners' 2008 tax return. Talecris reported the $1 million payment as "rent" on the original Form 1099–MISC, and petitioners reported the $1 million payment as rents received on one of their Schedules E. Although the intention of the parties is not determinative in the instant matter, we find that the terms of the lease and the surrounding circumstances indicate that the lessor and the lessee intended the $1 million lump-sum payment to be rent.

2. *Section 467*

Petitioners argue alternatively that, if we determine the $1 million lump-sum payment to be rental income, they are entitled to report the payment ratably over the 10-year life of the lease pursuant to section 467. In other words, petitioners argue that only a portion of the $1 million lump-sum payment is includible as income for 2008. Respondent argues that petitioners are required to include the entire $1 million payment they received from Talecris in gross income for the year of receipt (i.e., 2008) under section 467. Both parties base their respective arguments on section 467 and the regulations thereunder. Neither party cites any caselaw to support those arguments, and the issue is one of first impression in this Court.

Congress enacted section 467 to prevent lessors and lessees from mismatching the reporting of rental income and expenses. H.R. Rept. No. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 143; Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 285–288 (J. Comm. Print 1984). Section 467 provides accrual methods for allocating rents pursuant to a "section 467 rental agreement". In order to qualify as a section 467 rental agreement, an agreement must have: (1) increasing/decreasing rents or deferred/prepaid rents and (2) aggregate rental payments exceeding $250,000. Sec. 467(d)(2); sec. 1.467–1(c)(1), Income Tax Regs. Both parties

---

[12] That Mr. Moose and petitioner testified that they did not consider the lump-sum payment to be "rent" is completely at odds with the terms of the $1 million option and the effect of its exercise.

agree that the lease in this case qualifies as a section 467 rental agreement. [13]

a. *Allocation*

The accrual methods applicable to a section 467 rental agreement are set forth in section 467(b), which provides in part:

SEC. 467(b). ACCRUAL OF RENTAL PAYMENTS.—

(1) ALLOCATION FOLLOWS AGREEMENT.—Except as provided in paragraph (2), the determination of the amount of the rent under any section 467 rental agreement which accrues during any taxable year shall be made—

(A) by allocating rents in accordance with the agreement, and

(B) by taking into account any rent to be paid after the close of the period in an amount determined under regulations which shall be based on present value concepts.

Section 467(b)(1)(B) is inapplicable in the instant case, and the parties do not argue otherwise. Therefore, except as provided in section 467(b)(2), the rent determination for any rental period under section 467(b)(1)(A) is made by "allocating rents in accordance with the agreement". Section 467(b)(2) provides for the use of the constant rental accrual method in certain situations. As we explain *infra*, the constant rental accrual method is inapplicable in the situation before us.

Section 467(h) directs the Secretary to "prescribe such regulations as may be appropriate to carry out the purposes of this section". The first case to apply section 467 was *Piccadilly Cafeterias, Inc. v. United States*, 36 Fed. Cl. 330 (1996), which was decided before the promulgation of any temporary or final regulations. There the parties' dispute revolved around whether a lease that specified a rent payment schedule could be construed to be an allocation within the meaning of section 467(b)(1)(A). *Id.* at 332–333. In the absence of regulations the Court of Federal Claims held that a rent payment schedule could act as an allocation within the meaning of section 467(b)(1)(A) and required the taxpayer to report rent in accordance with the rent payment schedule. *Id.* at 335.

---

[13] The lease qualifies as a sec. 467 rental agreement because the rental payments increase in lease years 6–10 and the lease has aggregate rental payments exceeding $250,000.

Subsequently, on May 18, 1999, the Internal Revenue Service issued final regulations under section 467 that apply to the case before us. T.D. 8820, 1999–1 C.B. 1209. In general these regulations require a lessor and lessee to treat rents consistently and, in certain cases involving tax avoidance, require the parties to account for rent and interest under a prescribed method. Section 1.467–1(c), Income Tax Regs., sets forth rules for allocating rent to a rental period when a section 467 rental agreement contains a specific allocation schedule and also in the absence of such specific allocation schedule. Section 1.467–1(c)(2)(ii), Income Tax Regs., provides:

   (ii) Fixed rent allocated to a rental period.—(A) Specific allocation.— (1) In general.—If a rental agreement provides a specific allocation of fixed rent, as described in paragraph (c)(2)(ii)(A)(2) of this section, the amount of fixed rent allocated to each rental period during the lease term is the amount of fixed rent allocated to that period by the rental agreement.

   (2) Rental agreements specifically allocating fixed rent.—A rental agreement specifically allocates fixed rent if the rental agreement unambiguously specifies, for periods no longer than a year, a fixed amount of rent for which the lessee becomes liable on account of the use of the property during that period, and the total amount of fixed rent specified is equal to the total amount of fixed rent payable under the lease. For example, a rental agreement providing that rent is $100,000 per calendar year, and providing for total payments of fixed rent equal to the total amount specified, specifically allocates rent. *A rental agreement stating only when rent is payable does not specifically allocate rent.*

   (B) No specific allocation.—If a rental agreement does not provide a specific allocation of fixed rent (for example, because the total amount of fixed rent specified is not equal to the total amount of fixed rent payable under the lease), *the amount of fixed rent allocated to a rental period is the amount of fixed rent payable during that rental period.* If an amount of fixed rent is payable before the beginning of the lease term, it is allocated to the first rental period in the lease term. If an amount of fixed rent is payable after the end of the lease term, it is allocated to the last rental period in the lease term.

   [Emphasis added.]

In applying this regulation to the facts of this case we first find that the lease in question does not "specifically allocate" fixed rent to any rental period within the meaning of section 1.467–1(c)(2)(ii)(A), Income Tax Regs. However, the lease does provide for a fixed amount of rent payable during the rental period (i.e., rent payable pursuant to the terms of the lease). Accordingly, in the absence of a "specific" allocation in

the rental agreement, the amount of rent payable in 2008 must be allocated to petitioners' 2008 rental period pursuant to section 1.467–1(c)(2)(ii)(B), Income Tax Regs., which provides that "the amount of fixed rent allocated to a rental period is the amount of fixed rent payable during that rental period." Therefore, petitioners are required to include as gross income the entire $1 million lump-sum payment made pursuant to the terms of the lease for the year of receipt, 2008.

b. *Constant Rental Accrual*

Petitioners argue that they should be permitted to use the constant rental accrual method provided in section 467(b)(2) in order to spread their rental income to other years. However, this method is inapplicable because it was intended to allow the Commissioner to rectify tax avoidance situations, and the regulations provide that this method "may not be used in the absence of a determination by the Commissioner". Sec. 1.467–3(a), Income Tax Regs. No determination was made by respondent concerning tax avoidance. In addition, the constant rental accrual method applies to disqualified leasebacks and long-term agreements. Sec. 1.467–3(b), Income Tax Regs. The lease sub judice is neither. [14] Finally, any argument that section 467(b)(3)(B), which provides for use of the constant rental accrual method if "such agreement does not provide for the allocation referred to in paragraph (1)(A)", does not apply since we have already held that there was an allocation pursuant to the agreement within the purview of paragraph (1)(A) of section 467(b) and section 1.467–

[14] Sec. 1.467–3(b)(2) and (3), Income Tax Regs., provides:

(2) Leaseback.—A section 467 rental agreement is a leaseback if the lessee (or a related person) had any interest (other than a de minimis interest) in the property at any time during the two-year period ending on the agreement date. For this purpose, interests in property include options and agreements to purchase the property (whether or not the lessee or related person was considered the owner of the property for Federal income tax purposes) and, in the case of subleased property, any interest as a sublessor.

(3) Long-term agreement.—(i) In general.—A section 467 rental agreement is a long-term agreement if the lease term exceeds 75 percent of the property's statutory recovery period.

1(c)(2)(ii)(B), Income Tax Regs. Therefore, the constant rental accrual method does not apply to this matter.

c. *Proportional Rental Accrual*

With respect to section 467 rental agreements that do not provide for adequate interest on prepaid or deferred rent, the fixed rent for any rental period is the proportional rental amount. Sec. 1.467–1(d)(2)(ii), Income Tax Regs. Section 1.467–2(a), Income Tax Regs., describes section 467 rental agreements to which the proportional rental method applies:

> (a) Section 467 rental agreements for which proportional rental accrual is required.—Under § 1.467–1(d)(2)(ii), the fixed rent for each rental period is the proportional rental amount, computed under paragraph (c) of this section, if—
> (1) The section 467 rental agreement is not a disqualified leaseback or long-term agreement under § 1.467–3(b); and
> (2) The section 467 rental agreement does not provide adequate interest on fixed rent under paragraph (b) of this section.

As discussed above the lease before us is neither a disqualified leaseback nor a long-term rental agreement, and the parties make no argument to the contrary. Therefore the proportional rental accrual method will apply if the section 467 rental agreement at issue "does *not provide adequate interest* on fixed rent under paragraph (b) of this section." Sec. 1.467–2(a)(2), Income Tax Regs. (emphasis added). Concerning adequate interest on fixed rent, section 1.467–2(b), Income Tax Regs., provides:

> (b) Adequate interest on fixed rent.—(1) In general.—A section 467 rental agreement provides adequate interest on fixed rent if, disregarding any contingent rent—
> (i) *The rental agreement has no deferred or prepaid rent as described in § 1.467–1(c)(3)*;
> [Emphasis added.]

Petitioner argues that the $1 million lump-sum payment is prepaid rent. Section 1.467–1(c)(3)(ii), Income Tax Regs., defines prepaid rent as follows:

> (ii) Prepaid rent.—A rental agreement has prepaid rent under this paragraph (c)(3) if *the cumulative amount of rent payable as of the close of a calendar year exceeds the cumulative amount of rent allocated as of the close of the succeeding calendar year* (determined under paragraph (c)(3)(iii) of this section). [Emphasis added.]

Section 1.467–1(c)(3)(iv), *Example (2)*, Income Tax Regs., pro-
vides the following example which is instructive in com-
paring the "cumulative amount of rent *payable* as of the close
of a calendar year" to the "cumulative amount of rent *allo-
cated* as of the close of the succeeding calendar year."
(Emphasis added.)

> Example 2. (i) A and B enter into a rental agreement that provides
> for a 10-year lease of personal property, beginning on January 1, 2000,
> and ending on December 31, 2009. The rental agreement provides for
> accruals of rent of $10,000 during each month of the lease term. Under
> paragraph (c)(3)(iii) of this section, $120,000 is allocated to each calendar
> year. The rental agreement provides for a $1,200,000 payment on
> December 31, 2000.
>
> (ii) The rental agreement does not have increasing or decreasing rent
> as described in paragraph (c)(2)(i) of this section. The rental agreement,
> however, provides prepaid rent under paragraph (c)(3)(ii) of this section
> because *the cumulative amount of rent payable as of the close of a cal-
> endar year exceeds the cumulative amount of rent allocated as of the close
> of the succeeding calendar year*. For example, the cumulative amount of
> rent payable as of the close of 2000 ($1,200,000 is payable on December
> 31, 2000) exceeds the cumulative amount of rent allocated as of the close
> of 2001, the succeeding calendar year ($240,000). Accordingly, the rental
> agreement is a section 467 agreement.
>
> [Emphasis added.]

The lease entered into between Talecris and Wintermans
does not provide for prepaid rent. First, it is necessary to
determine "the cumulative amount of rent payable as of the
close of * * * [the] calendar year". In 2008 Talecris paid rent
to Wintermans totaling $1,151,493.18 ($151,493.18 of
monthly rent for the plasma collection center and a $1 mil-
lion lump-sum payment pursuant to section 4.1(a)(v) of the
lease). Therefore, the cumulative amount of rent payable by
Talecris as of the close of the 2008 calendar year is
$1,151,493.18. Second, it is necessary to ascertain "the cumu-
lative amount of rent allocated as of the close of the suc-
ceeding calendar year" (i.e., 2009). As previously held, the
lease at issue does not specifically allocate fixed rent to any
rental period within the meaning of section 1.467–
1(c)(2)(ii)(A), Income Tax Regs. In the absence of a specific
allocation, the amount allocated to each year is the amount
payable for each rental period. Sec. 1.467–1(c)(2)(ii)(B),
Income Tax Regs. Although the record before us does not
include the exact amount of rent payable by Talecris for the

2009 calendar year, Talecris did have rent payable during 2009 based on the mathematical formula contained in the lease. It follows logically that the cumulative amount of rent payable as of the close of 2008 ($1,151,493.18) will not exceed the cumulative amount of rent allocated as of the close of 2009 ($1,151,493.18 plus rent payable during 2009). Accordingly, the section 467 rental agreement does not have prepaid rent pursuant to section 1.467–1(c)(3)(ii), Income Tax Regs.

Because the section 467 rental agreement has no prepaid rent, it is deemed to have "adequate interest on fixed rent" under section 1.467–2(b), Income Tax Regs. As discussed above, one requirement for the application of the proportional rental accrual method is that "[t]he section 467 rental agreement does not provide adequate interest on fixed rent". Sec. 1.467–2(a)(2), Income Tax Regs. Pursuant to section 1.467–2(b), Income Tax Regs.,[15] the lease between Talecris and Wintermans does provide for adequate interest on fixed rent. We hold that the proportional rental accrual method does not apply and therefore petitioners must report the $1 million lump-sum payment for 2008.

### 3. *Section 6662(a) Accuracy-Related Penalty*

Respondent determined that petitioners were liable for a section 6662(a) accuracy-related penalty of $58,117.20 for 2008. Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to a substantial understatement of income tax. Section 7491(c) provides that the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). However, once the Commissioner meets his burden of production, the burden of proof remains with the taxpayers, including the burden of proving that the penalty

---

[15] Sec. 1.467–2(b), Income Tax Regs., provides, in pertinent part:

(b) Adequate interest on fixed rent.—(1) In general.—A section 467 rental agreement provides adequate interest on fixed rent if, disregarding any contingent rent—

(i) The rental agreement has no deferred or prepaid rent as described in § 1.467–1(c)(3); * * *

is inappropriate because of reasonable cause under section 6664. *See* Rule 142(a); *Higbee v. Commissioner*, 116 T.C. at 446–447.

There is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A). Petitioners' understatement of income tax exceeds the greater of 10% of the tax required to be shown on their return or $5,000. [16]

Respondent has met his burden of production in that he has shown that petitioners improperly offset the $1 million lump-sum payment through a Schedule E deduction and that the understatement is substantial. *See Longoria v. Commissioner*, T.C. Memo. 2009–162, 2009 Tax Ct. Memo LEXIS 162, at *31.

Petitioners argue that they had reasonable cause because they relied on the advice of their C.P.A., Mr. Heldman. [17] Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayers' position and that the taxpayers acted in good faith with respect to that portion. *See Higbee v. Commissioner*, 116 T.C. at 448.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). The good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. *Id.* (citing *United States v. Boyle*, 469 U.S. 241 (1985)); sec. 1.6664–4(b), Income Tax Regs. Whether a taxpayer relies on the advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98; sec. 1.6664–4(c)(1), Income Tax Regs. For the reliance to be

---

[16] Petitioners reported a $143,773 tax liability on their 2008 return. The correct liability to be shown was over twice that amount.

[17] Petitioners concede that the accuracy-related penalty applies to portions of the underpayment attributable to all adjustments in the notice of deficiency which they previously conceded.

reasonable, "the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 99.

We are satisfied that petitioners' 2008 tax return was prepared by a competent professional with sufficient expertise. However, at trial petitioner testified that he "[b]riefly" reviewed the 2008 tax return before signing it and did not review the Schedule E at issue. Mr. Heldman testified that he did not sit down with petitioners to discuss the prepared tax return before petitioners signed the return. Unconditional reliance on a tax return preparer or C.P.A. does not by itself constitute reasonable reliance in good faith; taxpayers must also exercise "[d]iligence and prudence." *Estate of Stiel v. Commissioner*, T.C. Memo. 2009–278, 2009 Tax Ct. Memo LEXIS 273, at *5 (quoting *Marine v. Commissioner*, 92 T.C. 958, 992–993 (1989), *aff'd without published opinion*, 921 F.2d 280 (9th Cir. 1991)). Taxpayers have a duty to read their returns. "Reliance on a preparer with complete information regarding a taxpayer's business activities does not constitute reasonable cause if the taxpayer's cursory review of the return would have revealed errors." *Id.* (citing *Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 662–663 (1987)). Petitioner was a successful businessman who should have recognized that the $1 million Schedule E deduction for "contribution to construct" was money that, even had it been related to the acquisition and construction of the plasma collection center, would not have been deductible in total in 2008. In fact, the deduction was intended to cancel out the $1 million in rental income that petitioner now claims was improperly reported. Claiming reliance on Mr. Heldman and choosing to not adequately review the contents of a tax return is not reasonable reliance in good faith, and we will not permit petitioners to avoid an accuracy-related penalty for substantially understating their income tax liability. Accordingly, we hold that petitioners are liable for the accuracy-related penalty under section 6662(a).

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*