T.C. Memo. 2021-40

UNITED STATES TAX COURT

ANNA ELISE WALTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6405-18.            Filed March 30, 2021.

<u>Frank Agostino</u>, <u>Robert L. Lowe</u>, and <u>Jonathan A. Zandi</u>, for petitioner.

<u>Jonathan Bartolomei</u> and <u>Rachel L. Schiffman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, <u>Judge</u>: Petitioner, Anna Elise Walton, failed to include on her 2015 Federal income tax return $169,425 in nonemployee compensation that she had earned that year. Detection of this omission by the automated underreporter (AUR) program of the Internal Revenue Service (IRS) culminated in the

[*2] determination of a deficiency of $62,514 and an accuracy-related penalty under section 6662(a) of $12,503.[1]  In this Court Ms. Walton does not contest the deficiency determination[2] but instead challenges the propriety of the penalty.  She primarily argues that she qualified for the reasonable cause exception to the penalty provided by section 6664(c).  We conclude that the imposition of the penalty was appropriate.

## FINDINGS OF FACT

This case was tried in New York, New York.  We draw the following facts from the parties' stipulations and supporting exhibits, as well as the exhibits and testimony presented at trial.  Ms. Walton lived in New York when she timely filed her petition.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1986, as amended, in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[2]Ms. Walton concedes that she received and failed to report nonemployee compensation of $169,425 and taxable interest of $3 for 2015.  Respondent concedes that Ms. Walton received nontaxable payments from qualified education programs of $12,809 and is entitled to deduct on her Schedule C, Profit or Loss From Business, car and truck expenses of $15,834, office expenses of $9,082, travel expenses of $28,152, meal expenses of $4,540, other expenses of $12,378, and expenses for the business use of her home of $14,074.

[*3] A.     <u>Ms. Walton's Business Background</u>

Ms. Walton is a social psychologist whose work focuses on management and organizational governance issues. From September 2012 until the end of 2014 she worked for Continuous Learning Group (CLG) as a partner in its governance practice. In late 2014 CLG informed Ms. Walton that her practice no longer fit its business interests, and the parties worked out separation details, including a severance and bonus payment that Ms. Walton received in 2015.

After leaving CLG, Ms. Walton launched a sole proprietorship named Organizational & Governance Consulting. She provided consulting work mostly to nonprofit clients, including Brown University and the National Geographic Society, as well as to her former employer, CLG. Ms. Walton's clients paid her by direct deposit into her Citibank business account.

B.     <u>Ms. Walton's 2015 Tax Return</u>

In early January 2016 Ms. Walton began to work on her 2015 tax return. To assist her in this effort Ms. Walton turned to Douglas Milo, a certified public accountant (C.P.A.) who had prepared her tax returns for approximately 20 years. Mr. Milo has over 30 years of experience as a C.P.A., and his firm prepares approximately 1,000 tax returns per year.

[*4]   On January 20, 2016, Ms. Walton emailed Mr. Milo, stating: "I am sure I need to pay taxes. If I did the math right, I earned about $525k in 1099 pay". She based this estimate on the amounts deposited into her Citibank business account, which she had used to generate an Excel spreadsheet. Mr. Milo relied on the $525,000 amount when determining that Ms. Walton was required to make an estimated tax payment for the fourth quarter of 2015.

On February 21, 2016, Ms. Walton sent an email to Mr. Milo attaching six tax reporting forms for 2015. Specifically, she attached Form W-2, Wage and Tax Statement, from CLG, as well as Forms 1099-MISC, Miscellaneous Income, from the following five entities: (i) Brown University, showing a payment of $40,117, (ii) CLG, showing a payment of $19,489, (iii) Just Born, Inc., showing a payment of $163,981, (iv) National Geographic Society, showing a payment of $99,278, and (v) the Society of Corporate Secretaries and Governance, showing a payment of $28,161. The amounts reported on these Forms 1099-MISC totaled $351,026.

On April 12, 2016, Renee Campanile, a C.P.A. with Mr. Milo's firm, sent two emails to Ms. Walton. In the first email she asked Ms. Walton: "Did you send us all the 1099s? The 1099s for income that we have add up to 351,026, and the 1099s for subs adds up to 130,480. Should we use these numbers or the 525 and 140 per your email?" She also noted that the firm was missing "Dividend Income

[*5] from Pershing and Continuous Learning (1099)", "Mortgage Interest to Citimortgage and OCWEN (1098)", "Any tuition (1098T), College savings plan contributions/distributions", and "Charitable contributions". In her second email Ms. Campanile asked for "any other expenses to pick up."

On April 14, 2016, Ms. Walton responded to Ms. Campanile, providing an itemized list of her mortgage interest, tuition and tax payments, charitable contributions, business expenses, utilities, insurance, and medical expenses. Ms. Walton's email did not respond to Ms. Campanile's inquiries about the "1099s for income" or "Dividend Income from Pershing and Continuous Learning (1099)". The next day, Ms. Campanile repeated her question regarding dividend income, which prompted a later email from Ms. Walton attaching a Form 1099-MISC issued by CLG and an email attaching statements of investment income under accounts jointly owned by Ms. Walton and her children. Neither Ms. Walton nor Ms. Campanile revisited the issue of "1099s for income" as part of their April back-and-forth.

Mr. Milo's firm thereafter obtained an extension for filing Ms. Walton's Federal income tax return until October 15, 2016. On September 29, 2016, Mr. Milo emailed Ms. Walton a list of "items I need to complete your return". In particular he sought her Forms 1099-DIV, Dividends and Distributions, from CLG

[*6] and Citibank, respectively, her business travel expenses, and her business meal and entertainment expenses. After Ms. Walton responded that she "attached the 1099s to the last emails", Mr. Milo confirmed that "I have all the 1099s and the kids accounts, * * * the taxes and interest on the house * * * [and] the charities as well."

In the case of a discrepancy between an estimate provided by a client and source documentation later supplied, Mr. Milo's firm typically would rely on the documentation when preparing a tax return. Since Ms. Walton did not address the discrepancy regarding "1099s for income", a staff member at Mr. Milo's firm calculated Ms. Walton's business income relying solely on the Forms 1099-MISC he received on February 21, 2016.

The practice of Mr. Milo's firm was, after preparation of the return but before the due date, to mail the return and an efiling authorization form, together with a self-addressed envelope, to the client. Mr. Milo's firm would request oral authorization for efiling from certain longstanding clients, with the understanding that the client would send the written authorization later. Mr. Milo obtained such oral authorization from Ms. Walton for the filing of her return, and his firm thereafter efiled it.

[*7]   Ms. Walton did not review her 2015 draft Federal income tax return before Mr. Milo's firm efiled it on her behalf.  She trusted in Mr. Milo's expertise and experience and believed that he would be able to identify any issues related to the return.  Ms. Walton skimmed over a copy of her return after filing and thought that the totals were correct.

C.    The IRS Examination and Notice of Deficiency

The IRS AUR program detected a mismatch between the income on Ms. Walton's tax return and the amounts that her clients reported to the IRS on their Forms 1099-MISC.[3]  As a result the IRS issued Ms. Walton a computer-generated letter CP 2501 informing her that she had failed to report nonemployee compensation of (1) $75,696 from the Consumers Union of United States, Inc., and (2) $93,730 from Phoenix House Foundation, Inc.  On October 2, 2017, the IRS sent Ms. Walton a computer-generated letter CP 2000 proposing an additional tax liability of $62,514, a substantial tax understatement penalty of $12,503, and

---

[3]The AUR program matches "third-party-reported payment information against * * * [a taxpayer's] already-filed" tax return.  Essner v. Commissioner, T.C. Memo. 2020-23, at *11.  When there is a discrepancy, the AUR program calculates a proposed deficiency based on the statutory scheme and prepares a letter to the taxpayer requesting an explanation for the discrepancy.  Serv. Ctr. Adv. 200211040 (Mar. 15, 2002).  If the taxpayer does not respond, the program will issue a notice of deficiency.  Id.  If the taxpayer does not respond to the notice of deficiency, the deficiency will be assessed.  Id.

[*8] statutory interest of $4,785.  After Ms. Walton did not respond, the IRS issued a notice of deficiency that determined the adjustments previously proposed.

OPINION

I.    Burden of Proof and Production

Section 7491(c) provides generally that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty".  This burden requires the Commissioner to come forward with sufficient evidence showing that the imposition of the penalty is appropriate.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the burden of production is met, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's [penalty] determination is incorrect."  Id. at 447.

As relevant here section 6662(a) and (b)(2) imposes a 20% penalty upon the portion of any underpayment of tax that is attributable to "[a]ny substantial understatement of income tax."  The parties do not dispute that the understatement of tax on Ms. Walton's 2015 return constituted a substantial understatement in this context.

The Commissioner's burden of production, however, may also include establishing compliance with section 6751(b), which requires that penalties be

**[*9]** "personally approved (in writing) by the immediate supervisor of the individual making such determination".  Chai v. Commissioner, 851 F.3d 190, 217 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; see also Graev v. Commissioner, 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016).  Ms. Walton argues that respondent has not satisfied his burden of production because he has not demonstrated compliance with the supervisory approval requirement.

No such showing was necessary.  Section 6751(b)(2)(B) carves out an exception to the supervisory approval requirement for "any * * * penalty automatically calculated through electronic means."  We have recently explored the contours of this exception, explaining that it encompasses a penalty "determined mathematically by a computer software program without the involvement of a human IRS examiner".  Walquist v. Commissioner, 152 T.C. 61, 70 (2019).

The penalty at issue here, automatically generated by the AUR computer program, fits under section 6751(b)(2)(B).  The AUR program ascertained through third-party document matching that Ms. Walton had failed to report nonemployee compensation of $169,425, then computed a tax liability of $62,514, and finally calculated a penalty equal to 20% of the tax ($62,514 × 20% = $12,503).  See

[*10] Internal Revenue Manual (IRM) pt. 20.1.5.3.1(1) and (2) (Jan. 24, 2012).

When Ms. Walton failed to respond to the computer-generated letter CP 2000, the

AUR program automatically generated a notice of deficiency setting forth a

deficiency and penalty in these amounts. See IRM pt. 20.1.5.1.6(9) (Jan. 24,

2012). Because the penalty was determined mathematically by a computer

software program without the involvement of an IRS examiner, we conclude that

the penalty was "automatically calculated through electronic means." See

sec. 6751(b)(2)(B). Respondent thus was not obligated to comply with the

supervisory approval requirement. See Walquist v. Commissioner, 152 T.C. at 70-

74.

II.    Reasonable Cause

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not

apply to any portion of an underpayment if it is shown that there was reasonable

cause for the taxpayer's position and that the taxpayer acted in good faith with

respect to that portion. See Higbee v. Commissioner, 116 T.C. at 448. The

taxpayer bears the burden of proving reasonable cause and good faith. See id.

at 446-447.

"Reasonable cause requires that the taxpayer have exercised ordinary

business care and prudence as to the disputed item." Neonatology Assocs., P.A. v.

[*11] Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The decision as to whether the taxpayer acted with reasonable cause and in good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor in determining the existence of "reasonable cause" is the taxpayer's efforts to ascertain her proper tax liability. See id.

Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98 (citing United States v. Boyle, 469 U.S. 241 (1985)); sec. 1.6664-4(b), Income Tax Regs. For the reliance to be reasonable, a taxpayer must prove: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99; cf. Estate of Thompson v. Commissioner, 370 F. App'x 141, 144 (2d Cir. 2010).

"Unconditional reliance on a tax return preparer or C.P.A. does not by itself constitute reasonable reliance in good faith; taxpayers must also exercise '[d]iligence and prudence.'" Stough v. Commissioner, 144 T.C. 306, 323 (2015)

**[\*12]** (quoting <u>Estate of Stiel v. Commissioner</u>, T.C. Memo. 2009-278, 2009 WL 4877742, at \*2); <u>see also</u> <u>Woodsum v. Commissioner</u>, 136 T.C. 585, 595-596 (2011). "Even if all data is furnished to the preparer, the taxpayer still has a duty to read the return and make sure all income items are included." <u>Magill v. Commissioner</u>, 70 T.C. 465, 479-480 (1978), <u>aff'd</u>, 651 F.2d 1233 (6th Cir. 1981); <u>see also</u> <u>Metra Chem Corp. v. Commissioner</u>, 88 T.C. 654, 662 (1987). "Reliance on a preparer with complete information regarding a taxpayer's business activities does not constitute reasonable cause if the taxpayer's cursory review of the return would have revealed errors." <u>Stough v. Commissioner</u>, 144 T.C. at 323 (quoting <u>Estate of Stiel v. Commissioner</u>, 2009 WL 4877742, at \*2); <u>see also</u> <u>Woodsum v. Commissioner</u>, 136 T.C. at 595-596; <u>Metra Chem Corp. v. Commissioner</u>, 88 T.C. at 662.

Ms. Walton contends that she satisfied section 6664(c)(1) by relying on Mr. Milo, her experienced and long-time C.P.A., to prepare an accurate return. Even assuming arguendo that Ms. Walton provided the missing Forms 1099-MISC to Mr. Milo's firm or that she told Mr. Milo to use the income amounts from her Citibank records rather than the income amounts from the documents she sent, she admittedly did not review her tax return before authorizing Mr. Milo's firm to file it. Although we understand that Ms. Walton has developed a high level of trust in

**[*13]** Mr. Milo, "the taxpayer still has a duty to read the return and make sure all income items are included." Magill v. Commissioner, 70 T.C. at 479-480; see also Stough v. Commissioner, 144 T.C. at 323. As of January 2016 Ms. Walton was well aware that she had earned approximately $525,000 from her consulting work, and even a cursory review of her return would have revealed the omission of $169,426--over 32% of her total nonemployee compensation for that year.

As we have explained before, a taxpayer is not required to "duplicate the work of his return preparer". Woodsum v. Commissioner, 136 T.C. at 595. Nor is an "omission of an income item in a return prepared by a third party * * * necessarily fatal to a finding of reasonable cause and good faith on the taxpayer's part." Id. at 595-596. "Rather, for purposes of this opinion, we assume that the reasonable cause defense may be available to a taxpayer who conducts a review of his third-party-prepared return with the intent of ensuring that all income items are included, and who exerts effort that is reasonable under the circumstances, but who nonetheless fails to discover an omission of an income item." Id. at 596. Ms. Walton failed to do the bare minimum (i.e., review her tax return before its filing) or expend reasonable effort under the circumstances. See id.; see also Stough v. Commissioner, 144 T.C. at 323 ("Claiming reliance on * * * [a tax return preparer] and choosing to not adequately review the contents of a tax return is not reasonable

**[*14]** reliance in good faith[.]").  We accordingly hold that Ms. Walton does not satisfy the section 6664(c)(1) exception.

III.  <u>Conclusion</u>

For these reasons we conclude that Ms. Walton has not carried her burden of showing that her failure to report $169,425 of income was attributable to reasonable cause and that she had acted in good faith.  She thus is liable for an accuracy-related penalty with respect to the underpayment of tax attributable to that failure.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.