T.C. Memo. 2018-48

UNITED STATES TAX COURT

DAVID WILLIAMS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

NUTRATECH, LTD, GLOBALTREX, LLC, TAX MATTERS PARTNER,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21637-15, 24256-15.        Filed April 9, 2018.

William R. Leighton, for petitioners.

Sheila R. Pattison and Roberta L. Shumway, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  By a notice of deficiency (notice) dated May 22, 2015,

respondent determined deficiencies in the Federal income tax of petitioner David

[*2] Williams for tax years 2010 and 2011 (years at issue) and accuracy-related penalties under section 6662(a)[1] as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2010 | $72,865 | $14,573 |
| 2011 | 43,560 | 8,712 |

In that notice respondent disallowed, inter alia, portions of deductions of $137,761 and $110,814 that Mr. Williams had claimed on his Schedules F, Profit or Loss From Farming, for the respective years at issue. On August 20, 2015, Mr. Williams timely filed a petition with this Court for redetermination.

By notices of final partnership administrative adjustment dated June 29, 2015, respondent disallowed portions of depreciation deductions of $122,797 and $157,433 that NutraTech LTD (NutraTech) had claimed on its Schedules F for the respective years at issue.[2] On September 23, 2015, GlobalTrex LLC (GlobalTrex),

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In those respective notices, as a result of respondent's disallowance of portions of NutraTech's depreciation deductions claimed on its Schedules F for the years at issue, respondent determined that NutraTech's net earnings from self-employment had increased by $1,228 and $1,574 for the respective years at issue.

**[*3]** the tax matters partner for NutraTech, filed a petition for readjustment of partnership items under section 6226.[3]

These cases were consolidated for trial, briefing, and opinion. After concessions by Mr. Williams and GlobalTrex, the following issues remain for decision:

(1) whether Mr. Williams' and NutraTech's Schedule F activities during the years at issue constituted activities not engaged in for profit within the meaning of section 183 and

---

[3]Partnership provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, begin with the presumption that TEFRA applies to any entity that is required to file a partnership return. Sec. 6231(a)(1)(A). But there is an exception for small partnerships. A "small partnership" is any partnership having 10 or fewer partners each of whom is an individual (other than a nonresident alien), a C corporation, or an estate of a deceased partner. Sec. 6231(a)(1)(B)(i). As is implicit in this exception, a partnership will not be considered to be a "small partnership" if any partner during the tax year is a passthrough partner. See Brennan v. Commissioner, T.C. Memo. 2012-187, aff'd sub nom. Ashland v. Commissioner, 584 F. App'x 573 (9th Cir. 2014); sec. 301.6231(a)(1)-1(a)(2), Proced. & Admin Regs. A passthrough partner is a partnership, estate, trust, S corporation, nominee, or other similar person through whom other persons hold an interest in the partnership and includes disregarded entities such as single-member LLCs. See sec. 6231(a)(9); 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49; Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121.

Because NutraTech had GlobalTrex, a single-member LLC, as one of its partners, the small partnership exception of sec. 6321(a)(1)(B)(i) does not apply and NutraTech is subject to the unified audit and litigation procedures of secs. 6221-6234, commonly referred to as the TEFRA provisions.

**[*4]**  (2) whether Mr. Williams is liable for accuracy-related penalties under section 6662(a) for each of the respective years at issue.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Mr. Williams resided in Texas when the petition was filed at docket No. 21637-15.  NutraTech was formed and operated in Texas, and its principal place of business was also in Texas when that the petition was filed at docket No. 24256-15.

NutraTech is a limited partnership.  GlobalTrex, a single-member LLC, serves as its general and tax matters partner.  Mr. Williams wholly owns GlobalTrex and is the only other partner in NutraTech.

I.    Mr. Williams' Background

Mr. Williams grew up on his family's ranch in the Texas Panhandle.  On their property Mr. Williams' family raised cattle and farmed corn, maize, sugar, and beets.  Beginning in junior high, Mr. Williams worked for his father on their property primarily raising hogs and feeding cattle.  At no time was Mr. Williams involved in the financial aspects of his family's ranch.

After graduating from high school, Mr. Williams left the family's ranch to attend the University of Houston.  After one year he transferred to Southwest

[*5] Texas State University in San Marcos (Southwest Texas State) where he obtained his B.A. degree in business administration. While pursuing his degree at Southwest Texas State, Mr. Williams took accounting courses but did not take any courses in ranching, farming, or animal husbandry.

From 1979 through 1982 Mr. Williams attended Texas Chiropractic College in Pasadena, Texas, where he obtained his chiropractic degree and a B.S. degree in biochemistry. In 1982 Mr. Williams opened his own chiropractic practice in Kerrville, Texas (Kerrville). In 1985 Mr. Williams sold his chiropractic practice. At all relevant times after he sold his practice, Mr. Williams continued to live in the Kerrville area.

## II.  Mr. Williams' Various Business Ventures

At a time not established by the record, but after Mr. Williams sold his chiropractic practice in 1985, he became very interested in researching and writing on the topic of alternative health remedies. This new passion led him to publish a newspaper called "Alternatives".

Since 2003, and through 2014, Mr. Williams has operated his research and publishing business as a disregarded entity doing business as Global Search LLC

[*6] (Global Search).  During those years, Mr. Williams reported Global Search's net profits on his Schedules C, Profit or Loss From Business, as follows:[4]

| Year | Gross income | Total expenses | Net profit (loss) |
| --- | --- | --- | --- |
| 2003 | $1,045,111 | $438,972 | $606,139 |
| 2004 | 1,279,212 | 573,218 | 705,994 |
| 2006 | 438,342 | 389,800 | 48,542 |
| 2007 | 449,708 | 413,210 | 36,498 |
| 2008 | 463,964 | 423,928 | 40,036 |
| 2009 | 483,315 | 355,076 | 128,239 |
| 2010 | 477,510 | 182,857 | 294,653 |
| 2011 | 482,763 | 215,972 | 266,791 |
| 2012 | 499,177 | 135,841 | 363,336 |
| 2013 | 508,777 | 203,651 | 305,126 |
| 2014 | 515,163 | 257,396 | 257,767 |
| Total | 6,643,042 | 3,589,921 | 3,053,121 |

During the years at issue, Mr. Williams devoted approximately 32 hours a week to Global Search.[5]

---

[4]Mr. Williams' Form 1040, U.S. Individual Tax Return (return), for his tax year 2005 is not in the record before us.

[5]On the record before us, it is unclear how many hours per week Mr. Williams devoted to Global Search from 2003 through 2004, 2006 through 2009, and 2012 through 2014.

[*7] Moreover, since at least 2000 and through 2012 Mr. Williams has operated his firearms business, S & B Cycles, as a sole proprietorship. He reported S & B Cycles' net profits and losses on his Schedules C as follows:[6]

| Year | Gross income | Total expenses | Net profit (loss) |
|------|------|------|------|
| 2000 | -0- | $1,443 | ($1,443) |
| 2001 | ($3,551) | 989 | (4,540) |
| 2002 | 1,074 | 3,401 | (2,327) |
| 2003 | (291) | 7,444 | (7,735) |
| 2004 | 1,278 | 2,103 | (825) |
| 2006 | -0- | 7,007 | (7,007) |
| 2007 | 7,005 | 13,703 | (6,698) |
| 2008 | 4,313 | 32,551 | (28,238) |
| 2009 | 3,422 | 37,552 | (34,130) |
| 2010 | -0- | -0- | -0- |
| 2011 | 31,851 | 2,722 | 29,129 |
| 2012 | 63,760 | 2,266 | 61,494 |
| Total | 108,861 | 111,181 | (2,320) |

III.  The Ranch Property

On January 14, 2000, Mr. Williams purchased a 507.27-acre tract of land nine miles northwest of Kerrville in Gillespie County, Texas (tract I). On June 28,

---

[6]See supra note 4.

[*8] 2000, NutraTech purchased a 577-acre tract of land (tract II) that was contiguous to tract I. On April 15, 2002, Mr. Williams transferred his interest in tract I to NutraTech.[7] On August 30, 2006, NutraTech purchased a 50.68-acre tract of land nine miles northwest of Kerrville in Gillespie County, Texas (tract III). (We will refer to tract I, II, and III collectively as the ranch property.)

A.     Ranch Property Description

The ranch property is a 1,138.35-acre tract[8] of rural agricultural/recreational land comprising rolling hills and creek bottom valleys with elevations ranging between 1,900 and 2,190 feet. It contains 1.3 miles of frontage along spring-fed West Goat Creek. That creek provides running water year round and is dammed in two places creating a 4.25-acre lake and a 1-acre lake in the center and southeast part of the property, respectively. At the time of acquisition, however, some of the creek beds were full of gravel and the springs were not running properly.

---

[7]On April 15, 2002, Mr. Williams also transferred his undivided interest in a 2.7-acre tract of land nine miles northwest of Kerrville in Gillespie County, Texas, to NutraTech. The record does not reflect when Mr. Williams acquired his undivided interest in that tract of land.

[8]The parties stipulate that the ranch property is 1,138.35 acres. We note that the sum of the acreage of tract I, II, III, and the undivided interest does not equal 1,138.35. Since, however, the acreage of the property is not a material issue in these cases, we will use the stipulated acreage amount.

[*9]   Vegetation on the ranch property consists of native grasses, a moderate to heavy cover of cedar trees along the hills, junipers, and a moderate cover of oak trees spread throughout the ranch property.  The surface of the ranch property contains little topsoil.  Further, when the ranch property was purchased, the only structures on the property were a livestock barn, a livestock shed, and a mobile home that were all built in 1977.  Only certain portions of the ranch property were fenced in.

At the time of purchase, the ranch property had an agricultural tax exemption.  During the years at issue, that agricultural tax exemption remained in place.

B.     Structures Added to the Ranch Property

The following structures have been added to the ranch property:  (1) a shop building with two attached sheds; (2) an equipment shed; (3) a foreman house; (4) four carports; (5) a mobile home; (6) a shooting pavilion; (7) a butcher shop; (8) a

[*10] creek house;[9] (9) a barn;[10] (10) a manufactured home; and (11) two office buildings.[11]

### C.     The Initial Cattle Operation Plan

When Mr. Williams and NutraTech acquired the ranch property, Mr. Williams intended to live on the property, not to raise cattle.  Initially, Mr. Williams was in favor of purchasing a smaller tract of land, approximately 25-50 acres, that had running water through the property.  Mr. Williams concluded, however, that such a property would not be available in the area; and he decided that if he wanted running water through his property, he would need to purchase a larger tract of land.  Therefore, after the ranch property was acquired, Mr. Williams approached his neighbors to discuss how they had generated profits from their respective properties.  From those discussions, Mr. Williams learned that

---

[9]In 2002 Mr. Williams completed construction of the creek house, and has lived in it ever since.  Mr. Williams, however, recently constructed a new home on the ranch property.  As of the time of trial in these cases, Mr. Williams is in the process of moving into that home.

[10]In 2002 Mr. Williams completed construction of the barn.  It is not a livestock barn that would be used for a cattle operation.  Instead, it is a storage barn that is insulated, climate controlled, and has been finished out for showroom or entertainment purposes.

[11]In 2009 NutraTech completed construction of the two office buildings. Since then, NutraTech has rented those office buildings to Mr. Williams for use in his Schedule C business.

**[*11]** they generated profits from personally raising cattle, or leasing their land for others to raise their cattle. Thereafter, Mr. Williams decided that he would run a feeder stocker cattle operation (cattle operation) on the ranch property.[12]

At no time, including before he started the cattle operation, did Mr. Williams create a formal business plan, prepare any financial statements for the cattle operation,[13] consult with any experts in the field of raising cattle,[14] or check with the Gillespie County Extension Service to determine how many animal units could be sustained on the ranch property.[15] Nevertheless, before beginning the

---

[12]There are two different types of cattle operations: (1) feeder stocker and (2) cow/calf. The first, a feeder stocker cattle operation, requires one to purchase calves that weigh 300 to 400 pounds each with the intention to raise and feed those calves on the ranch owner's land until they reach slaughter weight, which is approximately 900 to 1,000 pounds each. It takes approximately six months for the calves to reach slaughter weight. The second, a cow/calf cattle operation, requires one to breed calves on his or her property until the calves reach 300 to 400 pounds and then sell them to an individual looking to purchase calves for his or her feeder stocker cattle operation.

[13]At no time did Mr. Williams borrow money to finance the operation of the Schedule F activities.

[14]Mr. Williams discussed the prospective cattle operation with his brother, who owned a ranch in the Texas Panhandle and had experience in ranching activities. We note that his brother's ranch is in a different part of Texas with a landscape very different from the ranch property in these cases.

[15]The Gillespie County Extension Service agents generally know how many animal units can be sustained on certain parcels of land because the terrain and the grasses that grow in Texas can vary from county to county.

[*12] cattle operation Mr. Williams estimated that the ranch property could sustain approximately 50-60 head of cattle and would take approximately four to five years to become profitable. Mr. Williams based that estimate on the fact that he believed each cow would require 20-25 acres of land.[16]

At a time not established by the record, Mr. Williams brought a few head of cattle onto the ranch property to begin the cattle operation.[17] Thereafter, Mr. Williams incrementally acquired cattle for that operation on the ranch property. At no time did Mr. Williams advertise the cattle operation under a trade name or business name. During the years at issue Mr. Williams devoted approximately six to eight hours a week working on the ranch property moving cattle from one pasture to another, repairing perimeter fencing, and repairing broken gates.

---

[16]With respect to rendering the ranch property suitable for the cattle operation, Mr. Williams determined that he needed to build adequate perimeter fencing, clear the cedar trees and junipers, and clear the creek beds.

[17]On the record before us, it is unclear exactly how many head of cattle Mr. Williams acquired, when he acquired them, or how many were on the ranch property in a given year. The earliest indication that we have in the record before us is that on his 2007 Schedule F, Mr. Williams reported that he purchased "four bred Angus cows" on September 28, 2007. Mr. Williams testified, however, that he may have purchased cattle before 2007 and failed to report those cattle on his returns. Moreover, Mr. Williams also testified that he has had anywhere from 15 to 25 cattle on the ranch property during a given year. At the time of trial in these cases, Mr. Williams had approximately 19 head of cattle on the ranch property.

**[*13]** D.   <u>Employees on the Ranch Property</u>

Beginning in 2006 Mr. Williams hired two employees to help him. From 2006 through 2008 Mr. Williams employed Russell Everett, a commercial welder. During his time at the ranch property, Mr. Everett built and repaired the perimeter fencing, erected metal buildings, and rebuilt the livestock pens on the ranch property.[18] From 2006 through 2012 Mr. Williams employed Freddy Garcia. Mr. Williams did not check Mr. Garcia's background before offering him employment on the ranch property. Mr. Garcia, however, represented to Mr. Williams that he had previous cattle ranching experience on his family's farm in Mexico. Thereafter, Mr. Williams hired Mr. Garcia, who, during his time at the ranch property, raised Mr. Williams' cattle, kept track of the cattle records, and built perimeter fencing on the ranch property.[19] In 2012 Mr. Garcia abruptly left the

---

[18]On the record before us, it is unclear how many hours a week Mr. Everett worked on the ranch property, or how often Mr. Everett communicated with Mr. Williams with respect to decisions regarding the ranch property.

[19]On the record before us, it is unclear how many hours a week Mr. Garcia worked on the ranch property or how often Mr. Garcia communicated with Mr. Williams with respect to decisions regarding the ranch property.

[*14] ranch property and took with him Mr. Williams' cattle records for 2006 through 2012.[20]

IV.    The Modified Cattle Operation Plan

In 2013 Mr. Williams decided to transition the initial cattle operation to a cow/calf cattle operation.  Mr. Williams decided to implement the modified cattle operation because he had encountered a series of problems on the ranch property, including feral hogs, fires, and the inability to build adequate perimeter fencing on the ranch property, that he believed were detrimental to the success of the original cattle operation.[21]

---

[20]Mr. Garcia was responsible for keeping track of the cattle records during his employment from 2006 through 2012.  The purpose of the cattle records was to remain in compliance with Texas State and Federal laws.

[21]The modified cattle operation did not require adequate perimeter fencing because cattle generally do not wander off the property they are born on.  In contrast, in a feeder stocker cattle operation the cattle, which are not born on the property, will immediately leave it if it lacks adequate perimeter fencing.

After experiencing years of losses, in 2010 Mr. Williams leased 1,070 acres of the ranch property to Mike Powers for one year.

[*15] V.    Ranch Property's Financial Performance

Neither Mr. Williams nor NutraTech has ever earned a profit from the cattle operation.  Mr. Williams reported the following net losses on his Schedules F:[22]

| Year | Gross income | Total expenses | Net profit (loss) |
|------|------|------|------|
| 2000 | -0- | $125,643 | ($125,643) |
| 2002 | $43,688 | 144,616 | (100,928) |
| 2003 | 14,973 | 183,698 | (168,725) |
| 2004 | 7,951 | 168,089 | (160,138) |
| 2006 | 1,163 | 153,112 | (151,949) |
| 2007 | -0- | 179,982 | (179,982) |
| 2008 | 1,895 | 183,892 | (181,997) |
| 2009 | 251 | 189,313 | (189,062) |
| 2010 | -0- | 138,076 | (138,076) |
| 2011 | -0- | 110,817 | (110,817) |
| 2012 | -0- | 68,394 | (68,394) |
| 2013 | 100 | 29,178 | (29,078) |
| 2014 | 2,000 | 84,819 | (82,819) |
| 2015 | -0- | 3,120 | (3,120) |
| Total | 72,021 | 1,762,749 | (1,690,728) |

---

[22] Mr. Williams' 2001 Schedule F is not in the record before us.  See supra note 4.

**[\*16]** In addition, NutraTech reported net losses of $179,110 and $231,920 on its 2010 and 2011 Schedules F, respectively.

VI.   Mr. Williams' and NutraTech's Returns for Tax Years 2010 and 2011

Mr. Williams' longtime certified public accountant (C.P.A.),[23] Stuart Wright, prepared his returns for tax years 2010 and 2011, as well as NutraTech's Forms 1065, U.S. Return of Partnership Income (partnership return), for tax years 2010 and 2011.[24] (We will refer to the 2010 return, the 2011 return, the 2010 partnership return, and the 2011 partnership return, collectively, as Mr. Williams' respective returns.) Mr. Wright prepared Mr. Williams' respective returns using information that he received from Mr. Williams' bookkeeper, Myrta Gonzales.[25] Ms. Gonzales has been Mr. Williams' bookkeeper since 2007 and does the bookkeeping for all of Mr. Williams' activities, including Mr. Williams' Schedule F activities.

---

[23]Mr. Wright's engagement with Mr. Williams did not include auditing services.

[24]NutraTech was formed in 1999. However, only NutraTech's 2010 and 2011 partnership returns are in the record before us.

[25]Ms. Gonzales is not licensed as a C.P.A. in the United States. At trial Mr. Williams testified that Ms. Gonzales was licensed as a C.P.A. in Mexico, but there is nothing else in the record to confirm or deny that assertion. Accordingly, the Court declines to find this testimony as a fact.

[*17] During the years at issue Ms. Gonzales' bookkeeping responsibilities included collecting and opening the mail that was delivered to the ranch property, paying bills that arrived in Mr. Williams' mail, categorizing the income and expense reports for the years at issue, and communicating with Mr. Wright. Thereafter, Ms. Gonzales faxed Mr. Wright itemized reports that showed Mr. Williams' and NutraTech's respective categorized income and expense reports for the tax years at issue. At no time did Ms. Gonzalez prepare formal financial statements for purposes of analyzing Mr. Williams' Schedule F activities. Ms. Gonzales, however, did not send to Mr. Wright the source documents to allow him to corroborate the information on the respective income and expense reports that she had faxed to him for each of those tax years.

Moreover, at no time did she or Mr. Williams ever physically meet with Mr. Wright. Before preparing Mr. Williams' respective returns, Mr. Wright never discussed with Mr. Williams his entitlement to the loss deductions on his respective Schedules F. After Mr. Wright finished preparing Mr. Williams' respective returns, he sent them back to Mr. Williams for his signature. Upon receiving those respective returns, Mr. Williams reviewed the first few pages of each return by himself. At no time after receiving those respective returns did Mr. Williams ask for or receive any advice from Mr. Wright.

[*18] VII.    Respondent's Examination of Mr. Williams' Returns

On February 26, 2014, respondent's examiner Chad Galentine received written supervisory approval to impose accuracy-related penalties under section 6662(a) with respect to the Schedules C and F activities that Mr. Williams reported on his 2010 and 2011 returns.

OPINION

I.    Section 183

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  In general, however, a taxpayer may not deduct expenses incurred in connection with activities not engaged in for profit, such as activities primarily carried on as sport, as a hobby, or for recreation, to offset taxable income from other sources.  Sec. 183(a) and (b); sec. 1.183-2(a), Income Tax Regs.  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  The Court of Appeals for the Fifth Circuit, to which appeal in these cases would generally lie, has held that for a deduction to be allowed under section 162 or 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary purpose and intent

**[*19]** of realizing an economic profit independent of tax savings. Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995), aff'g, T.C. Memo. 1993-634.

The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs. Whether the taxpayer had the requisite profit objective is determined by looking at all the facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. We give greater weight to objective facts than to a taxpayer's statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. In the case of NutraTech, we gauge the profit intent from that of Mr. Williams, the managing member of its general partner, GlobalTrex. See Taube v. Commissioner, 88 T.C. 464, 479-481 (1987). Evidence from years outside the years at issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in the subject years. See, e.g., Smith v. Commissioner, T.C. Memo. 1993-140.

Pursuant to section 183(d), an activity is presumed to be engaged in for profit if the activity produces gross income in excess of deductions for any three of

[*20] the five consecutive years which end with the taxable year, unless the Commissioner establishes to the contrary. See Wadlow v. Commissioner, 112 T.C. 247, 250 (1999). Mr. Williams' Schedule F activities failed to produce gross income in excess of deductions at any time during their operation. Nor does the record establish that NutraTech's Schedule F activities ever produced gross income in excess of deductions for purposes of invoking the presumption. Accordingly, the presumption does not apply in these cases.

The Commissioner's determinations in a notice are generally presumed correct, and the taxpayer ordinarily bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). If, however, the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Sec. 7491(a)(1) and (2). Because we decide the section 183 issue on the preponderance of the evidence, the burden of proof is irrelevant. See Knudsen v. Commissioner, 131 T.C. 185, 188-189 (2008).

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to consider in evaluating a taxpayer's profit objective, such as: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the

[*21] taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation were involved.  No single factor is determinative of the taxpayer's intention to make a profit, and more weight may be given to some factors than others.  Golanty v. Commissioner, 72 T.C. at 426; see Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd on another issue, 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.  We examine each of these factors in turn.

A.     Manner in Which Activity Is Conducted

The fact that the taxpayer carries on an activity in a businesslike manner may indicate a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  This determination requires that we consider whether the taxpayer:  (1) maintained complete and accurate books and records; (2) conducted the activity in a manner resembling that in which successful practitioners conduct similar business activities; (3) changed operating methods, adopted new techniques, or abandonment of unprofitable activities in a manner consistent with an intent to

[*22] improve profitability; and (4) prepared a business plan. Id.; see Keating v. Commissioner, T.C. Memo. 2007-309, 2007 WL 2962774, at *4 ("Numerous court opinions mention that a businesslike operation often would involve a business plan.").

Mr. Williams contends that he operated the Schedule F activities in a businesslike manner because he kept separate books and records for the ranching operation, used an outside bookkeeper to track the revenue and expenses, created an informal business plan before he started the operation, and made changes in response to issues that arose. In response, respondent contends that Mr. Williams' books and records served no part in controlling costs or increasing profitability, Mr. Williams did not create a written business plan, and Mr. Williams failed to make changes in a timely manner in response to issues that arose.

Although Ms. Gonzalez created itemized income and expense spreadsheets for the Schedule F activities during the years at issue to aid Mr. Wright in preparing Mr. Williams' respective returns, Mr. Williams did not use those spreadsheets or the underlying source documents to minimize losses and/or generate profit. See McKeever v. Commissioner, T.C. Memo. 2000-288, 2000 WL 1297710, at *11 (explaining that to indicate profit motive taxpayers must use their books and records to try to reduce losses and achieve profitability). In fact

[*23] Mr. Williams never requested Ms. Gonzalez to prepare financial statements for the purpose of analyzing the Schedule F activities.

In addition, Mr. Williams did not have a written business plan. He did not maintain budgets or prepare economic forecasts. In fact the record is devoid of any credible evidence that Mr. Williams engaged in any meaningful financial management with respect to the Schedule F activities. See Foster v. Commissioner, T.C. Memo. 2012-207, 2012 WL 3000350, at *5. Although Mr. Williams testified that he kept track of his Schedule F activities' income and expenses, along with the underlying source documentation, the evidence demonstrates that his recordkeeping was nothing more than a conscious attention to detail. See Golanty v. Commissioner, 72 T.C. at 430.

Further, while a taxpayer need not maintain a sophisticated cost accounting system, the taxpayer should keep records that make informed business decisions possible. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), aff'g T.C. Memo. 1985-523. For a taxpayer's books and records to indicate a profit motive, the books and records should enable the taxpayer to cut expenses, generate or increase profits, or evaluate the overall performance of the operation. See Abbene v. Commissioner, T.C. Memo. 1998-330, 1998 WL 643647, at *6. Mr. Williams did not use his or NutraTech's records to do any of these things, and

**[\*24]** he did not prove that the records kept were sufficient to enable him to manage the financial aspects of the ranching activities.  See Keating v. Commissioner, T.C. Memo. 2007-309, 2007 WL 2962774, at \*5.  Mr. Williams' financial management was limited to having Ms. Gonzalez keep records and provide them to Mr. Wright for tax purposes.

Perhaps the most important indication of whether an activity is being carried on in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income.  See Dodge v. Commissioner, T.C. Memo. 1998-89, 1998 WL 88175, at \*5, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999).  Mr. Williams contends that he changed his operating methods, adopted new techniques, and abandoned unprofitable methods that contributed initially to his losses.  The record, however, does not support such a conclusion.  For example, Mr. Williams started his cattle operation in 2000, and by the end of 2004, five years after he started his operation and when he had projected profitability, Mr. Williams had reported total net losses of $555,434 on his 2000-04 Schedules F.[26]  Despite the amount of losses, Mr. Williams did not hire a ranch hand until 2006 to help him on the ranch property.

---

[26]This amount does not include net losses from Mr. Williams' 2001 Schedule F because that schedule is not in the record before us.  See supra note 22.

[*25] Further, it was not until 2013, over a decade after he started his cattle operation and approximately two years after the years at issue, that Mr. Williams decided to transition his cattle operation from a stocker feeder cattle operation to a cow/calf cattle operation. At that point, Mr. Williams had reported net losses of $1,575,711 and NutraTech's losses (to the extent of the evidence in the record) totaled $411,030.[27]

Accordingly, this factor favors respondent.

### B. Expertise of Taxpayer or His Advisers

Preparation for an activity by the extensive study of its accepted business, economic, and scientific practices, or consultation with those who are experts therein, may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs.; see Engdahl v. Commissioner, 72 T.C. 659, 668 (1979).

Mr. Williams presented no evidence that he conducted a basic investigation of the potential profitability of the Schedule F activities. Instead, he relied on his own familiarity and expertise with respect to ranching and that of his neighbors and brother. With respect to his own background, Mr. Williams has never received any formal education in farming, ranching, or animal husbandry. Even when accounting for his experience on his family's ranch, at no time was he

[27]See supra note 4.

**[*26]** involved in the financial aspects of that operation. With respect to his discussions with his brother and neighbors, there is no evidence in the record to suggest that he discussed with these individuals how to run a profitable ranch.[28] Moreover, at no point did Mr. Williams consult with experts on the operation of the ranching activities or check with the Gillespie County Extension Service to determine how many animal units could be sustained on the ranch property.[29] Mr. Williams hired a bookkeeper to keep records, but, as discussed supra, he did not use those records to cut expenses, generate or increase profits, or evaluate the overall performance of the ranching activities.

Accordingly, this factor favors respondent.

C.    Taxpayer's Time and Effort Devoted to the Activity

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an intention to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. If, however, a taxpayer spends little time on the activity but hires a competent and qualified person to carry on the activity, a profit motive may still be indicated. Id.

---

[28] See supra note 14.

[29] See supra note 15.

[*27] Mr. Williams concedes that he spent a limited amount of time working on the ranch property but contends that his employment of Mr. Garcia, a competent and qualified person, indicates that he had an intention to make a profit through the ranching activities. Conversely, respondent contends that Mr. Williams did not establish that Mr. Garcia was a competent and qualified person. See Burrus v. Commissioner, T.C. Memo. 2003-285, slip op. at 32-33.

During the years at issue, Mr. Williams devoted approximately six to eight hours per week to working on the ranch property. Conversely, during that same time, Mr. Williams devoted approximately 32 hours per week to Global Search, his successful Schedule C business. Given the fact that Mr. Williams devoted so little time to the Schedule F activities during the years at issue, the determination of whether this factor supports the existence of a profit motive hinges upon the competency and qualifications of Mr. Garcia. See id.

In these cases, Mr. Williams failed to present any evidence of Mr. Garcia's competency or qualifications. In fact Mr. Williams did not even check Mr. Garcia's background before hiring him to work on the ranch property. Moreover, the record is devoid of any evidence suggesting how many hours Mr. Garcia spent working on the ranch property, or whether and how often Mr. Garcia communicated with Mr. Williams. See id. On the record before us, we find that

[*28] Mr. Williams failed to prove he hired a competent and qualified person to carry on the Schedule F activities.

Accordingly, this factor favors respondent.

D.      Expectation That Assets Used in the Activity May Appreciate

An expectation that assets used in the activity will appreciate in value and therefore may produce an overall economic profit may indicate a profit motive even if the taxpayer derives no operational profit. Sec. 1.183-2(b)(4), Income Tax Regs. A profit objective, however, may be inferred from such expected appreciation of the activity's assets only where the expected appreciation exceeds the operating expenses and would be sufficient to recoup the accumulated losses of prior years. Foster v. Commissioner, T.C. Memo. 2012-207, 2012 WL 3000350, at *7; see Golanty v. Commissioner, 72 T.C. at 427-428.

The ranch property was appraised at $8,765,000 in March 2017. Mr. Williams has not submitted any credible evidence of his adjusted basis in the ranch property.[30] There is no credible evidence in the record that the expectation

---

[30]With respect to the adjusted basis of the ranch property, all we have in the record before us is that as part of its purchase of tract II, NutraTech executed a promissory note in the amount of $582,000. Even assuming that amount was equivalent to the adjusted basis of that tract, we still do not have in the record before us the adjusted basis for tract I or tract III.

[*29] of future appreciation of the ranch property even begins to approach the amounts of losses reported since the beginning of the Schedule F activities.

Accordingly, this factor is neutral.

E.     Taxpayer's Success in Carrying On Similar or Dissimilar Activities

The fact that a taxpayer engaged in similar activities and converted them from unprofitable to profitable enterprises may indicate that the taxpayer is engaged in the present activity for profit, even though the activity is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.

Mr. Williams contends that his ability to convert his other businesses from unprofitable to profitable and his success in those business activities indicate the existence of a profit motive.  In response, respondent contends that Mr. Williams has demonstrated success only in one other nonrelated business activity, Global Search, and that his other business activities, such as S & B Cycles, were not successful.

Although Mr. Williams has been successful in running Global Search, a health and wellness business, his work as a researcher and writer is not sufficiently similar to operating ranching activities so as to indicate that he could do so successfully.  Dodds v. Commissioner, T.C. Memo. 2013-76, at *19.  Moreover, prior success in a business does not necessarily imply a profit objective for a new

[*30] activity that might be a hobby or sport. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *27.

Accordingly, this factor favors respondent.

F.  Taxpayer's History of Income or Loss From the Activity

A taxpayer's history of income or loss with respect to an activity may indicate the presence or absence of a profit motive. Sec. 1.183-2(b)(6), Income Tax Regs. A series of losses during the initial stage of an activity does not necessarily indicate a lack of profit motive. Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. The goal, however, must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup losses incurred in the intervening years. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967).

During the years at issue, Mr. Williams reported net losses of $138,076 and $110,817, on his 2010 and 2011 Schedules F, respectively. In fact Mr. Williams has never earned a profit from the cattle operation. In addition, NutraTech reported net losses of $179,110 and $231,920 on its 2010 and 2011 Schedules F, respectively.

Accordingly, this factor favors respondent.

**[*31]** G.     Amount of Occasional Profits Earned

The amount of occasional profits earned in relation to the amount of losses incurred, the amount of investment, and the value of assets used in the activity may indicate a profit motive.  Sec. 1.183-2(b)(7), Income Tax Regs.  The opportunity to earn substantial profits in a highly speculative venture may ordinarily be sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.  Id.

Neither Mr. Williams nor NutraTech has ever earned a profit from the cattle operation.

Accordingly, this factor favors respondent.

H.     Taxpayer's Financial Status

A lack of substantial income from sources other than the activity may indicate that the activity is engaged in for profit.  Id. subpara. (8).  Substantial income from sources other than the activity (particularly if losses from the activity generate substantial tax benefits) may indicate the activity is not engaged in for profit, especially if personal or recreational elements are involved.  Id.; see Golanty v. Commissioner, 72 T.C. at 429.

Mr. Williams did not earn any income from his ranching activities to pay basic living expenses.  In addition, NutraTech reported significant losses for each

[*32] of its subject years. Mr. Williams' income from other sources, including Global Search, allowed him to continue the ranching activities despite years of sustained losses. Additionally, the ranching activities generated generous tax savings in the form of net losses to offset his other income.[31]

Accordingly, this factor favors respondent.

I.      Elements of Personal Pleasure or Recreation

The presence of personal pleasure or recreational elements in carrying on an activity may indicate the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. The fact that the taxpayer derives personal pleasure from engaging in the activity is not by itself determinative that the activity is not engaged in for profit. See id.

Mr. Williams derived no personal pleasure from raising cattle. Therefore, he contends that the Schedule F activities lacked significant recreational appeal. In response, respondent contends that Mr. Williams purchased the ranch property

---

[31]We note that the record is unclear whether petitioners believed that they needed to conduct a for-profit business on the ranch property in order to claim the agricultural exemption and obtain the corresponding real estate tax savings. Consequently we will not include in our analysis but do note the existence of the reduced real estate liability from the characterization of the land as being ranch property.

**[*33]** with the intent to live on it and that improvements he made to the property were consistent with that intent, not with an intent to run a profitable business.

We find credible the testimony of Mr. Williams that he derives no personal pleasure from raising cattle.

Accordingly, this factor favors petitioners.

J.      Conclusion

Of the nine factors listed in section 1.183-2(b), Income Tax Regs., seven favor respondent, one favors petitioners, and one is neutral.  After considering the factors and the facts and circumstances of these cases, we conclude that Mr. Williams did not have an actual, honest profit objective in operating his or NutraTech's ranching activities during the years at issue.  Accordingly, the deductions for expenses paid with respect to the ranching activities are subject to the limitations of section 183.

II.     Section 6662(a) Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty on any portion of an underpayment of tax that is attributable to the taxpayer's "negligence or disregard of rules or regulations" or "substantial understatement of income tax".  An understatement of income tax is substantial if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required

[*34] to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Negligence includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b), Income Tax Regs.

The Commissioner bears the burden of production with respect to the taxpayer's liability for a section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). As part of that burden, respondent must also show that he complied with the written approval requirement of section 6751(b)(1). See Graev v. Commissioner, 149 T.C. __, __ (slip op. at 14) (Dec. 20, 2017), supplementing 147 T.C. __ (Nov. 30, 2016). Once the burden of production is met, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. See Higbee v. Commissioner, 116 T.C. at 446-447.

On the record before us, we find that if the Rule 155 computations confirm substantial understatements of income tax for the taxable years at issue, then respondent has met his burden of production.[32] On the record before us, we

---

[32]We note that the record contains evidence, in the form of a civil penalty approval form, that respondent complied with the requirements of sec. 6751(b)(1).

(continued...)

**[\*35]** further find that Mr. Williams was required, but failed, to maintain adequate records to substantiate his deductions. Sec. 1.6662-3(b), Income Tax Regs. On that record, we find that respondent has also met his burden of production with respect to the accuracy-related penalty under section 6662(a) attributable to Mr. Williams' negligence.[33]

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on the advice of a professional may demonstrate reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id. In this connection, advice is defined as a

---

[32](...continued)
See Graev v. Commissioner, 149 T.C. __, __ (slip op. at 14) (Dec. 20, 2017), supplementing 147 T.C. __ (Nov. 30, 2016).

[33]See supra note 32.

**[*36]** communication that reflects the adviser's analysis or conclusion. Woodsum

v. Commissioner, 136 T.C. 585, 593 (2011); see sec. 1.6664-4(c)(2), Income Tax

Regs. Moreover, in order for a taxpayer

> to rely reasonably upon advice so as to possibly negate a section
> 6662(a) accuracy-related penalty determined by the Commissioner,
> the taxpayer must prove by a preponderance of the evidence that the
> taxpayer meets each requirement of the following three-prong test:
> (1) The adviser was a competent professional who had sufficient
> expertise to justify reliance, (2) the taxpayer provided necessary and
> accurate information to the adviser, and (3) the taxpayer actually
> relied in good faith on the adviser's judgment. * * *

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299

F.3d 221 (3d Cir. 2002).

A taxpayer's duty to file an accurate tax return generally may not be

avoided by the taxpayer's claim that he or she relied on a tax return preparer. See

Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662-663 (1987). Moreover, a

taxpayer's unconditional reliance on a C.P.A. does not, standing alone, constitute

reasonable reliance in good faith for purposes of section 6664(c)(1) and the

regulations thereunder. See Stough v. Commissioner, 144 T.C. 306, 323 (2015).

A taxpayer has an obligation to exercise "[d]iligence and prudence." Id. In

addition, a taxpayer has a duty to read a tax return that a C.P.A. prepares for the

taxpayer. See id. Even if a taxpayer provided all the information necessary to

**[*37]** enable a C.P.A. to prepare an accurate tax return, the taxpayer still has a duty to read the tax return and make sure it is accurate. See Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), aff'd, 651 F.2d 1233 (6th Cir. 1981). Furthermore, the mere fact that a C.P.A. prepared a tax return does not mean he or she opined on any or all of the items reported on that return. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100.

It is Mr. Williams' position, however, that he is not liable for the accuracy-related penalty for the years at issue because he had reasonable cause and acted in good faith with respect to his return position. In support of that position, Mr. Williams claims that he reasonably relied on the advice of his C.P.A. and was under no obligation to "challenge his return preparer's method of dealing with the issue of deductibility on his 2010 and 2011 tax returns."

While Mr. Wright did prepare Mr. Williams' returns and NutraTech's partnership returns for the years at issue, it does not necessarily follow that Mr. Wright provided advice for purposes of section 6664(c). In fact the record contains no evidence that Mr. Williams ever asked for or received advice from Mr. Wright with respect to those respective returns. See Woodsum v. Commissioner, 136 T.C. at 593; sec. 1.6664-4(c)(2), Income Tax Regs. Moreover, Mr. Williams never read or reviewed his completed returns for tax year 2010 and 2011,

**[\*38]** respectively.  See Stough v. Commissioner, 144 T.C. at 323; see also Magill v. Commissioner, 70 T.C. at 479-480.

On the record before us, we find that Mr. Williams has failed to carry his burden of establishing that there was reasonable cause for, and that he acted in good faith with respect to, the underpayments for his tax years 2010 and 2011.  On that record, we find that if Rule 155 computations confirm substantial understatements of income tax, Mr. Williams has failed to carry his burden of establishing that he is not liable for his tax years 2010 and 2011 for the accuracy-related penalties because of underpayments attributable to negligence, or alternatively, substantial understatements of income tax, under section 6662(a) and (b)(1) and (2).

We have considered all the other arguments of the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

**[\*39]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155 in docket No. 21637-15</u>.

<u>Decision will be entered for</u>

<u>respondent in docket No. 24256-15</u>.